FILED

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA

2013 JAN 16 P 4: 30

(Alexandria Division)

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

RICHARD GLASER, On Behalf of Himself )
and All Others Similarly Situated, )
)
Plaintiff, )
)
vs. )
) Civil Action No. 1:13CV60-LO/TCB
VERISIGN, INC., D. JAMES BIDZOS and )
GEORGE E. KILGUSS, III, ) CLASS ACTION COMPLAINT FOR
) VIOLATION OF THE FEDERAL
Defendants. ) SECURITIES LAWS
)
)

4. Based on Defendants' bullish statements concerning its ongoing business metrics and the strong forward earnings guidance, including projecting FY 2012 revenues "*in the range of $870 million to $880 million, representing an annual growth rate of between 13% and 14%*," that Defendants said the Company's ongoing business conditions supported during the Class Period, VeriSign's stock traded at inflated prices throughout the Class Period, trading above $50 per share by October 4, 2012.

5. Then, on October 25, 2012, after the close of trading, VeriSign shocked the market by disclosing that the U.S. Department of Justice ("DOJ") was reviewing its domain name pricing arrangements and that it was now doubtful that review would be complete in time to allow the U.S. Commerce Department to renew its contract before it expired on November 30, 2012. According to VeriSign, "[t]he Commerce Department, together with the Department of Justice, [was] reviewing the .com Registry Agreement's *pricing terms*." VeriSign also disclosed that the Company's 3Q '12 sales had been negatively impacted by industry efforts to stymie unseemly business practices. As a result, VeriSign had processed only 7.8 million new domain name registrations for .com and .net in the 3Q'12, *down* 1.1% from 3Q'11. Instead of adding "net names ... to the base [of] between *1.6 million and 1.9 million* names [during the 3Q'12], *reflecting continued growth in the underlying drivers of the Internet...*" as had been projected on July 26, 2012, in reality "VeriSign Registry Services [only] added *1.37 million* net new names" during the 3Q'12, *20% less* than the Company stated it was on track to register for the 3Q'12.

6. During a conference call held later that evening, VeriSign's Chief Executive Officer ("CEO") James Bidzos explained the 3Q '12 decline in new domain name registrations was due to enhanced efforts by search engines such as Google to tweak the algorithms that control search result page rankings over the past several months, lowering the rankings (and thus monetization) of dubious websites created merely to draw in traffic. According to Bidzos, these efforts by the search

engines had led to a significant decline in domain name owners not renewing their registrations with VeriSign. As a result, Defendants also lowered the Company's FY 2012 revenue outlook by $5 million, now stating revenue would not exceed $875 million.

7. In response to this new, the price of VeriSign stock fell precipitously from its October 25, 2012 closing price of $46.60 per share to close below $40 per share on October 26, 2012, *falling $7.21 per share, or 15.47%*, on extremely high volume of more than *12 times* the average daily trading volume over the prior three month period.

8. The true facts, which were known or recklessly disregarded by each of the Defendants but concealed from the investing public during the Class Period, were as follows:

(a) Challenges to the Company's registry pricing scheme that Defendants knew about but concealed from the market made it more likely than not that the U.S. DOJ and Department of Commerce would demand price concessions in exchange for leaving VeriSign in charge of operating the .com and .net networks;

(b) VeriSign's growth in domain name registrations was in decline;

(c) VeriSign was relying heavily on revenues from "parking" websites and other dubious websites focused on drawing in and monetizing traffic, rather than in providing cogent business leads;

(d) Defendants knew that Google and other Internet search engines had been tweaking their algorithms to improve the quality of their search results by ranking lower subpar quality websites, such as those which are not updated often or provided little or no content;

(e) Subpar domain name owners had stopped renewing their agreements with VeriSign as a result of the Internet search engine's efforts to discourage them by demonetizing their practices; and

(f) As a result, Defendants knew VeriSign's FY 2012 earnings guidance was not attainable.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5. Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

10. Venue is proper here pursuant to §27 of the 1934 Act. Acts and transactions giving rise to the violations of law complained of occurred here.

## THE PARTIES

11. Plaintiff Richard Glaser purchased VeriSign common stock as set forth in the attached Certification, which is incorporated herein by reference, and was damaged thereby.

12. Defendant VeriSign is a Delaware corporation headquartered at 12061 Bluemont Way, Reston, Virginia. Founded in 1995, the Company was headquartered in California until 2010. During the Class Period, VeriSign had approximately 155 million shares of common stock outstanding, which shares traded in an efficient market on the NASDAQ.

13. Defendant D. James Bidzos ("Bidzos") founded VeriSign and is, and was throughout the Class Period, VeriSign's Executive Chairman of the Board, President, CEO and a director.

14. Defendant George E. Kilguss, III ("Kilguss") is, and was throughout the Class Period, VeriSign's Senior Vice President and Chief Financial Officer ("CFO"), having been appointed to that position effective May 14, 2012.

15. The Defendants identified in ¶¶13-14 are referred to herein as the "Individual Defendants." The Individual Defendants are liable for the false statements pleaded herein, as those statements are each "group-published" information for which they are responsible.

## BACKGROUND TO THE CLASS PERIOD

16. VeriSign was founded by Defendant Bidzos in 1995 as a spin-off of the RSA Security certification services business. The new company served as a certificate authority ("CA") and its initial mission was "providing trust for the Internet and Electronic Commerce through our Digital Authentication services and products." Prior to selling its certificate business to Symantec in 2010 and moving its headquarters from California to Virginia, VeriSign had more than 3 million certificates in operation for everything from military to financial services and retail applications, making it the largest CA behind the encryption and authentication on the Internet, which most people recognize as the small padlock icon in their Web browser when shopping online or logging into a secure website.

17. In 2000, VeriSign acquired Network Solutions, which operated the .com, .net and .org generic top-level domains ("gTLD") under agreements with ICANN and the United States Department of Commerce. Those core registry functions formed the basis for VeriSign's naming division, which is now the Company's largest and most significant business unit. VeriSign divested the Network Solutions retail (domain name registrar) business in 2003, retaining the domain name registry (wholesale) function as its core Internet addressing business.

18. In 2006, the Coalition For ICANN Transparency ("CFIT") brought suit against VeriSign in the U.S. District Court for the Northern District of California alleging that VeriSign and ICANN broke competition law with their .com and .net registry agreements, which CFIT said were rigged allowing the Company to raise prices every year. According to a Securities and Exchange Commission ("SEC") filing, CFIT's members were: iRegistry, Name Administration, Linkz Internet Services, World Association for Domain Name Developers, Targeted Traffic Domains, Bret Fausett, Howard Neu and Frank Schilling. CFIT asserted claims, among others, under Sections 1 and 2 of

the Sherman Antitrust Act in connection with the Company's .com and .net Registry Agreements with ICANN.

19. After five years of hard fought litigation, including a successful appeal to the Ninth Circuit Court of Appeals, followed by the entry of a dismissal with prejudice on the basis of standing of CFIT's third amended complaint in its entirety back in the District Court, on May 11, 2011, CFIT and VeriSign announced that CFIT was essentially withdrawing its lawsuit.

20. Analysts lamented at the time that had CFIT won, it would have put a serious cramp on VeriSign's business.

21. On March 27, 2012, ICANN posted the renewal terms for the .com Registry Agreement which had been negotiated between it and VeriSign on ICANN's website for public review. In its Current Report on Form 8-K filed with the SEC on March 28, 2012, Defendants stated the ".com Registry Agreement [was] expected to be renewed on or before November 30, 2012."

## MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

22. The Class Period starts on June 25, 2012. On that day, VeriSign issued a press release announcing that on June 23, 2012, ICANN had approved the renewal of the .com Registry Agreement between VeriSign and ICANN (the "Agreement") for the term commencing on December 1, 2012 through November 30, 2018. VeriSign's Board of Directors had approved the renewal of the Agreement on June 16, 2012. Defendants filed a Current Report on Form 8-K with the SEC that day, which stated in pertinent part as follows:

> In accordance with the Cooperative Agreement between the U.S. Department of Commerce (the "Department") and VeriSign, the Department will now undertake a review of the renewal of the Agreement. The Department's approval of the renewal of the Agreement is required for the renewal to be effective. *The Agreement is expected to be renewed on or before November 30, 2012.* There can be no assurance that the Department will approve the renewal of the Agreement or that renewal will occur on or before November 30, 2012.

23. On July 13, 2012, VeriSign issued a press release entitled "Internet Grows to More than 233 Million Domain Names in the First Quarter of 2012." The press release stated in pertinent part as follows:

> More than seven million domain names were added to the Internet in the first quarter of 2012, bringing the total number of registered domain names to more than 233 million worldwide across all domains, according to the latest Domain Name Industry Brief, published by VeriSign, Inc. (NASDAQ: VRSN), the trusted provider of Internet infrastructure services for the networked world.
>
> The increase of 7.5 million domain names *equates to a growth rate of 3.3 percent over the fourth quarter of 2011, and marks the fifth straight quarter with greater than two percent growth*. Registrations have grown by more than 23 million, or 11 percent, since the first quarter of 2011.
>
> \* \* \*
>
> The .com and .net Top-Level Domains (TLDs) *experienced aggregate growth in the first quarter*, reaching a combined total of approximately 116.7 million active domain names in the adjusted zone for .com and .net. This represents a 2.5 percent increase in the base over the fourth quarter of 2011 and an 8.1 percent increase over the first quarter of 2011. *Additionally, the .com registry grew to more than 100 million domain names during the quarter.*
>
> New .com and .net registrations totaled 8.9 million during the quarter. This is a *7.7 percent increase year-over-year in new registrations*. The .com/.net renewal rate for the first quarter of 2012 was 73.9 percent, *up from 73.5 percent for the fourth quarter of 2011*.
>
> VeriSign's average daily Domain Name System (DNS) query load during the first quarter of 2012 was 66 billion, with a peak of 74 billion. Compared to the previous quarter, *the daily average increased 4 percent and the peak decreased 37 percent*.

24. On July 26, 2012, VeriSign issued a press release announcing VeriSign's 2Q'12 financial results. The press release, entitled "VeriSign Reports 13 Percent Year-Over-Year Revenue Growth in Second Quarter 2012," stated in pertinent part as follows:

> "The second quarter results demonstrate our *continued strong operating performance* and financial discipline," commented Jim Bidzos, executive chairman, president and chief executive officer of VeriSign. "Our share repurchases in the quarter, of $76 million, underscore our commitment to creating and delivering shareholder value."
>
> \* \* \*

**Business Highlights**

- *On June 23, 2012, the board of directors of Internet Corporation of Assigned Names and Numbers ("ICANN") approved the renewal of VeriSign's agreement to serve as the authoritative registry operator for the .com registry for the term commencing on Dec. 1, 2012, through Nov. 30, 2018.* The board of directors of VeriSign approved the renewal of the .com registry agreement on June 16, 2012. The U.S. Department of Commerce (the Department) is now reviewing the renewal of the .com registry agreement under the terms of the Cooperative Agreement between the Department and VeriSign.

- VeriSign Registry Services added 1.81 million net new names and ended the second quarter with approximately 118.5 million active domain names in the zone for .com and .net, *representing a 7.8 percent increase year-over-year.*

- In the second quarter, VeriSign processed a second quarter record 8.4 million new domain name registrations, *representing an increase of 4.2 percent year-over-year.*

25. During the conference call that followed the earnings release, Defendant Bidzos commented on the status of VeriSign's .com agreement renewal stating in pertinent part as follows:

On June 23, 2012, ICANN approved the renewal of VeriSign's agreement to service the operator of the .com registry for the term commencing on December 1, 2012, through November 30, 2018. As you may know, *the .com renewal agreement terms, including the pricing provisions, are substantially the same as the terms contained in the existing agreement*, except for new provisions regarding indemnification and audit rights.

The U.S. Department of Commerce, under an agreement called the Cooperative Agreement, is now reviewing the renewal of the .com registry agreement. *We expect their approval on the renewal of the .com agreement by November 30.*

26. During the July 26, 2012 call, Defendant Bidzos also stated that the Company then "expect[ed] the third quarter net names added to the base to be *between 1.6 million and 1.9 million names, reflecting continued growth in the underlying drivers of the Internet and seasonality.*" Defendant Kilguss stated as "to 2012 guidance, we now think revenue for 2012 should be in the range of $870 million to $880 million, *representing an annual growth rate of between 13% and 14%.*"

27. On September 5, 2012, Defendants Bidzos and Kilguss spoke at the Citi Technology conference in New York, New York.

28. On October 2, 2012, VeriSign issued a press release entitled "Internet Grows to More than 240 Million Domain Names in the Second Quarter of 2012." The press release stated in pertinent part as follows:

> More than seven million domain names were added to the Internet in the second quarter of 2012, bringing the total number of registered domain names at June 30, 2012, to more than 240 million worldwide across all domains, according to the latest Domain Name Industry Brief, published by VeriSign, Inc., the trusted provider of Internet infrastructure services for the networked world.
>
> The increase of 7.3 million domain names globally *equates to a growth rate of 3.1 percent over the first quarter of 2012, and marks the sixth straight quarter with greater than two percent growth*. Worldwide registrations have grown by 25.5 million, or 11.9 percent, since the second quarter of 2011.
>
> The .com and .net Top-Level Domains (TLDs) *experienced aggregate growth in the second quarter of 2012*, reaching a combined total of approximately 118.5 million domain names in the adjusted zone for .com and .net. *This represents a 1.6 percent increase in the base over the first quarter of 2012 and a 7.8 percent increase over the second quarter of 2011*. At June 30, 2012, the base of registered names in .com equaled 103.7 million names, while .net equaled 14.8 million names.
>
> New .com and .net registrations totaled 8.4 million during the second quarter of 2012. *This is a 4.2 percent year-over-year increase in new registrations*. The .com/.net renewal rate for the second quarter of 2012 was 72.9 percent, down from 73.9 percent for the first quarter of 2012.
>
> VeriSign's average daily Domain Name System (DNS) query load during the second quarter of 2012 was 68 billion, with a peak of 90 billion. Compared to the previous quarter, *the daily average increased 1.9 percent and the peak increased 21 percent.*

29. Based on Defendants' bullish statements concerning VeriSign's ongoing business metrics and the strong forward earnings guidance those conditional purportedly supported, the price of VeriSign stock traded at inflated prices throughout the Class Period, trading above $50 per share by October 4, 2012.

30. On October 25, 2012, after the close of trading, VeriSign issued a press release announcing the Company's 3Q'12 financial results. VeriSign shocked the market by disclosing that the DOJ was reviewing its domain name pricing arrangements and that it was now doubtful that the review would be complete in time to allow the Commerce Department to renew its contract before it

expired on November 30, 2012. According to Defendants, "[t]he Commerce Department, together with the Department of Justice, [was] reviewing the .com Registry Agreement's *pricing terms*." Defendants also disclosed that the Company's 3Q'12 sales had been negatively impacted by industry efforts to stymie unseemly business practices. As a result, VeriSign processed only 7.8 million new domain name registrations for .com and .net in the third quarter, *down* 1.1 percent from 3Q '11. Instead of adding "net names ... to the base [of] between *1.6 million and 1.9 million* names [during the 3Q'12], *reflecting continued growth in the underlying drivers of the Internet...*" as Bidzos had stated on July 26, 2012, in reality "VeriSign Registry Services [only] added *1.37 million* net new names" during the 3Q'12, *20% less* than Bidzos had just stated the Company was on track to register. CEO Bidzos explained during a conference call held following the earnings release that the 3Q'12 decline in new domain name registrations was due to enhanced efforts by search engines such as Google to tweak the algorithms that control search result page rankings over the past several months, lowering the ranking of dubious websites created merely to draw in traffic. According to Bidzos, this had led to a significant decline in domain name owners not renewing their agreements with VeriSign. As a result, Defendants also lowered the Company's FY 2012 revenue outlook by $5 million, now stating revenue would not exceed $875 million.

31. On this news, VeriSign's stock fell precipitously from its October 25, 2012 closing price of $46.60 per share to close below $40 per share on October 26, 2012, *falling $7.21 per share, or 15.47%*, on extremely high volume of more than *12 times* the average daily trading volume over the prior three month period.

32. The true facts, which were known, or recklessly disregarded, by each of the Defendants but concealed from the investing public during the Class Period, were as follows:

(a) Challenges to the Company's registry pricing scheme that Defendants knew about but concealed from the market made it more likely than not that the U.S. DOJ and Department

of Commerce would demand price concessions in exchange for leaving VeriSign in charge of operating the .com and .net networks;

(b) VeriSign's growth in domain name registrations was in decline;

(c) VeriSign was relying heavily on revenues from "parking" websites and other dubious websites focused on drawing in and monetizing traffic, rather than on providing cogent business leads;

(d) Defendants knew that Google and other Internet search engines had been tweaking their algorithms to improve the quality of their search results by ranking lower subpar quality websites, such as those which are not updated often or provided little or no content;

(e) Subpar domain name owners had stopped renewing their agreements with VeriSign as a result of the Internet search engine's efforts to discourage them by demonetizing their practices; and

(f) As a result, Defendants knew VeriSign's FY 2012 earnings guidance was not attainable.

## DEFENDANTS' SCIENTER

33. Defendants are VeriSign and its top officers and directors. Each ran VeriSign as a manager, dealing with important issues facing VeriSign's business, and controlled the grossly inflated statements concerning VeriSign's Class Period operational status, and VeriSign's ability to achieve its target revenues and earnings.

34. Each of the Individual Defendants, by virtue of their high-level positions with VeriSign, directly participated in the management of VeriSign, was directly involved in the day-to-day operations of VeriSign at the highest levels and was privy to confidential proprietary information concerning VeriSign and its business, operations, products, growth, financial statements and financial condition and was aware of or deliberately disregarded that false and misleading

statements were being made by and regarding the Company. Because of their managerial positions with VeriSign, each of the Individual Defendants had access to the adverse undisclosed information about VeriSign's business, financial condition and prospects and knew (or deliberately disregarded) that the adverse facts alleged herein rendered the positive representations made during the Class Period materially false and misleading.

35. Each Individual Defendant was personally familiar with the problems VeriSign faced and thus the decline in growth in domain name registrations and pricing challenges from the Internet community because they monitored VeriSign's revenue, closely monitoring the performance of VeriSign's operations via reports from VeriSign's Finance Department, which were generated and provided to the Individual Defendants on a regular basis. As a result of their monitoring, each Individual Defendant was aware that VeriSign would be unable to meet its projected results.

36. Each of the Individual Defendants participated in or failed to prevent the false reports regarding VeriSign's operational and financial condition during the Class Period to maintain the Company's high stock price.

## LOSS CAUSATION/ECONOMIC LOSS

37. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated VeriSign's stock price and operated as a fraud or deceit on Class Period purchasers of VeriSign stock by misrepresenting the Company's business success and future business prospects. Defendants achieved this façade of success, growth and strong future business prospects by blatantly misrepresenting the Company's business prospects. Later, however, when Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, VeriSign stock fell precipitously as the prior artificial inflation came out of the price of VeriSign stock. As a result of their purchases of

Case 1:13-cv-00060-LO-TCB Document 1 Filed 01/16/13 Page 13 of 17 PageID# 13

VeriSign stock during the Class Period, plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

38. During the Class Period, Defendants presented a misleading picture of VeriSign's business and prospects, instead of truthfully disclosing during the Class Period that VeriSign's business was not as healthy as represented.

39. These false claims of strong future results, among other statements detailed herein, caused and maintained the artificial inflation in VeriSign's stock price throughout the Class Period and until the truth was revealed to the market.

40. Defendants' false and misleading statements had the intended effect and caused VeriSign stock to trade at artificially inflated levels throughout the Class Period.

41. As investors and the market became aware on October 25, 2012 that VeriSign's actual business prospects were poorer than represented, which had been obfuscated by Defendants, the prior artificial inflation came out of the price of VeriSign stock, damaging investors.

42. As a direct result of Defendants' admissions and the public revelations regarding the truth about VeriSign's previous representations and its actual business prospects going forward, the price of VeriSign stock declined precipitously on October 26, 2012. These drops removed the inflation from the price of VeriSign stock, causing real economic loss to investors who had purchased the stock during the Class Period. In sum, as the truth about Defendants' fraud and VeriSign's business performance was revealed, the price of VeriSign stock plummeted, the artificial inflation came out of the stock and plaintiff and other members of the Class were damaged.

43. The significant decline in the price of VeriSign stock at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the decline in the price of VeriSign stock negates any inference that the loss suffered by plaintiff and other Class members was caused by

changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

44. This is a class action on behalf of purchasers of VeriSign common stock between June 25, 2012 and October 25, 2012, excluding Defendants (the "Class"). Excluded from the Class are officers and directors of the Company, as well as their families and the families of the Defendants. Class members are so numerous that joinder of them is impracticable.

45. Common questions of law and fact predominate and include: (i) whether Defendants violated the 1934 Act; (ii) whether Defendants omitted and/or misrepresented material facts; (iii) whether Defendants knew or recklessly disregarded that their statements were false; and (iv) whether the price of VeriSign common stock was inflated during the Class Period and the extent of and appropriate measure of damages.

46. Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violations of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

47. Plaintiff incorporates by reference ¶¶1-46 herein.

48. Defendants violated §10(b) and Rule 10b-5 by:

    (a)    Employing devices, schemes and artifices to defraud;

    (b)    Making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    (c)    Engaging in acts, practices and a course of business that operated as a fraud or deceit upon the Class in connection with their purchases of VeriSign publicly traded securities.

49.    Class members were damaged as they paid artificially inflated prices for VeriSign's publicly traded securities in reliance on the integrity of the market.

## COUNT II

### For Violations of §20(a) of the 1934 Act
### Against All Defendants

50.    Plaintiff incorporates by reference ¶¶1-49.

51.    The Individual Defendants acted as controlling persons of the Company within the meaning of §20(a) of the 1934 Act, 15 U.S.C. §78t(a), as alleged herein. By virtue of their stock ownership, and high-level positions, and participation in and/or awareness of the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading. VeriSign controlled the Individual Defendants and all of its employees.

52.    By reason of such wrongful conduct, the defendants are liable pursuant to §20(a) of the 1934 Act. As a direct and proximate result of the wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding plaintiff and other members of the Class damages together with interest thereon;

C.  Awarding plaintiff and other members of the Class costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

D.  Awarding plaintiff and other members of the Class such equitable/injunctive or other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: January 15, 2013

THE OFFICE OF CRAIG C. REILLY, ESQ.
CRAIG C. REILLY

_____
CRAIG C. REILLY (VSB # 20942)
111 Oronoco Street
Alexandria, VA 22314
Tel: 703/549-5354
Fax: 703/549-2604
Email: craig.reilly@ccreillylaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
Srudman@rgrdlaw.com
Mblasy@rgrdlaw.com

BOTTINI & BOTTINI, INC.
FRANCIS A. BOTTINI, JR.
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone: 858/914-2001
858/914-2002 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO THE FEDERAL SECURITIES LAWS

I, Richard Glaser, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint with my counsel and authorized its filing.

2. I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3. I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4. My purchases and sales of the securities of Verisign, Inc. during the Class Period are as follows:

    October 12, 2012 – sold 18 shares @ $47.83 per share

    October 22, 2012 – purchased 20 shares @ $47.23 per share

    October 22, 2012 – purchased 15 shares @ $47.30 per share

5. I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 15th day of January, 2013.



---
Richard Glaser